IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 4:25-CR-464 HEA |
| | ) |
| JOSEPH SEIFFERTT | ) |
| | ) |
| Defendant. | ) |

## DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE

Defendant Joseph Seiffertt, through Attorney William Marsh, respectfully requests that this Honorable Court grant a downward variance and impose a sentence of 60 months in the Bureau of Prisons. Such a term is sufficient but not greater than necessary to accomplish the sentencing objectives set forth in 18 U.S.C. § 3553(a). In support, he states:

Under the terms of his plea agreement, Joe Seiffertt is permitted to ask for any lawful sentence. Given that he pled to an amended charge of Possession of Child Pornography, this Court's sentencing discretion is no longer limited by a mandatory minimum term. Nevertheless, Joe is requesting a sentence of five years—what would represent the obligatory floor had he been convicted of the Receipt of Child Pornography as originally charged. The reason Joe is not requesting a lower sentence—despite having negotiated a disposition that would have permitted him to do so—is because he wants the

1

Court to appreciate his own recognition of the gravity of his conduct. Since his original arrest on companion state charges in 2024, Joe has put in considerable work to cultivate a stronger sense of self-awareness. Given these efforts, he understands that a substantial sentence is imminent and believes that—given all the unique and mitigating factors affecting his case—a term of 60 months sufficiently satisfies the sentencing directives of § 3553(a).

Shortly after graduating high school, Joe Seiffertt chose a path taken by very few kids from the relatively comfortable St. Louis suburb of Webster Groves where he grew up—he signed up with the Armed Forces. Specifically, he joined the United States Marine Corps in December of 2000—only nine months before the terrorist attacks of September 11. While Joe clearly never intended to pursue a life of ease and comfort by enlisting, he also did not anticipate being thrust into the crucible of a heated world conflict so quickly. During his five years of service, Joe was deployed to Iraq twice—with both tours coming during the height of insurgent hostilities. While he was lucky enough to make it home alive, he served with others who did not. Those losses, combined with a serious injury and multiple close calls on his own life, caused Joe to come home with some significant scar tissue—both literally and figuratively.

During his two tours of duty, Joe was stationed at Al-Asad Airbase in the Anbar region of Iraq. As a major convoy hub, Al-Asad was responsible for hosting large shipments of fuel, ammunition, construction materials, water, and food. Predictably, this made the base—along with its traffic—a magnet for insurgent fighters. Joe remembers coming under mortar attack so frequently that he and other soldiers coined the term

"Mortar Mondays." All told, he estimates living through dozens of attacks during his time at Al-Asad—and fearing for his life during every one of them.

Base attacks were not the only danger Joe faced in Iraq. As both a gate guard and water truck escort, he participated in convoys that were also vulnerable to mortar attacks and roadside bombs. He vividly remembers one occasion when a mortar struck near his group during a water convoy, shooting a piece of shrapnel between the eyes of a fellow marine. The young man died instantly, with Joe only 15 feet away. Understandably on edge after the incident, Joe developed an extreme sense of paranoia guarding the base's gates, fearing that any vehicle could be a suicide bomber. This hyper-vigilance persisted throughout Joe's tour, offering his nervous system little reprieve while he endured the remainder of his deployment in a state of anxious agitation.

As is often the case for soldiers who see active combat, the Joe Seiffertt who left for Iraq was a different man from the one who returned. While he received treatment for his physical injuries from the VA (Joe had severely lacerated his hand in a non-combat accident during his service with the Marines leading to paralysis of a major nerve and limited use of his forearm), he was initially unwilling to acknowledge the mental toll his service had taken. Joe's reluctance might be hard to understand today, but one must remember that the active pursuit of mental health services by soldiers during the aughts (Joe was honorably discharged as an E-5 Sergeant in 2005 having received multiple merit-based medals) was less common—seeking mental health treatment was stigmatized and something Joe equated with weakness. Accordingly, he suffered in isolation—despite receiving a PTSD diagnosis shortly after his discharge from the military. Sadly, his

decision to ignore the reality of this mental health condition would ultimately lead to the deterioration of his marriage and play a significant hand in the instant offense.

While Joe's marriage in 2010 began happy, his quiet pain led to alienation and estrangement. Unable and/or unwilling to express his emotional anguish, he took to isolating himself in the evenings after the children were put to bed. This fed a vicious cycle of snowballing acrimony and decreased intimacy. By the time of the instant offense, Joe's life had become a years-long groundhog day cycle of working long hours as an electrician to support his family (which he did diligently and well), spending time with his daughters in the evening before putting them to bed, retiring to the garage where he self-medicated his loneliness with alcohol and marijuana, and substituting his marriage's absence of intimacy by developing an addiction to pornography.

Based on the undersigned's experience, child pornography defendants fall under a broad spectrum ranging from hands-on offenders to people whose pornography addictions become so extreme that they seek increasingly taboo material (much the same way drug users escalate from smoking/insufflation to intravenous use as their addictions intensify). Joe is clearly someone who falls on the latter end of that spectrum. After nearly a decade[1] of nightly isolation in his garage, his pornography addiction—uninhibited by prodigious alcohol consumption—became increasingly insatiable, ultimately snowballing to include the type of materials underlying the instant offense. To be clear, Joe has never engaged in any hands-on conduct with children, nor does he present a threat in that regard. While he acknowledges the online conversation with another CP offender detailed in the plea

---

[1] While Joe reports cracks in his marriage early on, he indicates that the full-blown estrangement took root after the birth of his third child, who is now eight.

agreement might be interpreted to suggest otherwise, he urges the Court to recognize: 1-that he has never faced so much as an accusation of hands-on contact;[2] and, 2-that based on counsel's experience, the types of conversations among CP offenders in the chat rooms where materials are discussed and traded tend to be exceedingly hyperbolic and rarely reflect the participants' real-world proclivities.

Joe's arrest in 2024 served as a serious wake-up call. Having originally been charged by the state in St. Louis county, he posted bond in October of that year and finally began therapy through the VA the following month. Critically, he also quit drinking. In working with counselors via weekly sessions for the better part of a year, Joe has developed a strong sense of self-awareness with respect to his past compulsive behavior. While taking his confinement in stride, he does regret his inability to continue pursuing therapy in jail—having made great strides he wants to keep his momentum alive and looks forward to availing himself of the opportunity both in BOP and during any term of release.

While Joe prioritized improving himself during his term of bond supervision in the county, he also put significant effort into supporting his family—even while he was unable to see his children. As a high school graduate with five years of military service and two associates degrees, Joe is educationally and vocationally prepared to make a good living, which he did for many years. Generating a solid six figures as an electrician working for G4 Security and Sound, Joe afforded his wife the opportunity to live as a homemaker and

---

[2] All three of Joe's children were interviewed by Division of Family Services workers in the wake of his arrest. Based on those interviews, authorities decided that there was no need to conduct formal forensic examinations.

reside in a nice Webster Groves home. During his bond supervision, he took residence with and helped care for his father in Ballwin (who recently suffered from a stroke), continued working full time, and handed nearly every cent he earned over to his wife and children. Largely the result of his self-reckoning in therapy, Joe reports a much-improved relationship with his wife and hopes to resume supporting the family as soon as he possibly can. It is worth noting that she wants the same, and hopes the Court will impose a sentence that can give Joe the opportunity to resume providing financial support as quickly as possible.

In addition to the many mitigating factors affecting Joe's life, it is important to recognize that various policy considerations also support a below-guidelines sentence. The Supreme Court has unequivocally instructed that sentencing courts "may not presume that the Guidelines range is reasonable" but "must make an individualized assessment based on the facts presented." *Gall v. United States*, 552 U.S. 38, 50 (2007) (*citing Rita v. United States*, 551 U.S. 338, 351 (2007). A district court must "frame[ ] its final determination in line with 18 U.S.C. § 3553(a)'s overarching instruction to 'impose a sentence sufficient, but not greater than necessary' to accomplish the sentencing goals advanced in § 3553(a)(2)." *Kimbrough v. United States*, 552 U.S. 85, 111 (2007). Through this process, courts are permitted to categorically reject a sentencing guideline on policy grounds. *Id*. The bases for such a rejection here are twofold.

First, the Court should vary downward to circumvent the deleterious effect of the two-point enhancement assessed under §2G2.2(b)(6). This provision is applicable "if the offense involved a computer or an interactive computer service." Joe's possession of

obscene material was accomplished—as is the possession of virtually anything pictorial in modern society—with a computer. Given the state of modern technology, the use of a "computer" is inherent to the nature of the offense charged. As one judge has stated, "as widespread as computer use is now, enhancing for use of a computer is a little like penalizing speeding but then adding an extra penalty if a car is involved."[3] Mr. Seiffertt's guideline range is unreasonably inflated because he committed his offense in the most unremarkable way possible—with a computer. This warrants a downward variance.

Second, the Court should also vary downward to counter the five-point enhancement that Joe received under §2G2.2(b)(7). These points are added if the number of images at issue is 600 or more. Given that the median number of images in federal child pornography cases is 4,265,[4] commentators and judges have complained that "section 2G2.2(b)(7) fails to differentiate between the majority of offenders."[5] As a result, multiple district judges have granted significant variances to account for the unreasonably inflated guidelines that cover the vast majority of child pornography cases. *See, e.g., United States v. Raby*, 2009 WL 5173964 (S.D. W. Va. 2009) (granting a first-time child pornography offender a 90-month downward variance after rejecting the §2G2.2(b)(7) number of images enhancement on policy grounds); *United States v. Beierman*, 599 F.Supp. 2d 1087, 1094

---

[3] Federal Sentencing Practices and the Operation of the Federal Sentencing Guidelines: Reg'l Hearing Before the U.S. Sent'g Comm'n, at 5 (Nov. 2009) (statement of Robin J. Cauthron, Judge, W.D. Okla.), available at http://www.ussc.gov/Legislative_and_Public_Affairs/Public_Hearings_and_ Meetings/20091119–20/Agenda.html.

[4] Charles R. Breyer, Patricia K. Cushwa & Jonathan Wroblewski, U.S. Sent'g Comm'n, Federal Sentencing of Child Pornography: Non-Production Offenses 30 fig. 13 (2021), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2021/20210629_NonProduction-CP.pdf

[5] When All Files Count the Same: The Problem of Undifferentiated Images in Child Pornography Sentencing, 139 Harvard L. Rev. 1185 (Mar. 2026).

(N.D. Iowa 2009)(concluding that §2G2.2 is "entitled to considerably less deference than other guidelines"); *United States v. Jacob*, 631 F.Supp. 2d 1099, 112-13 (N.D. Iowa 2009)(categorically rejecting §2G2.2(b)(7) on policy grounds because it "unrealistically skews upward sentences for even 'average' defendants"); *United States v. Grinberg*s, 2008 WL 4191145, *10 (D. Neb. 2008)("because of the increased ability to easily and inexpensively capture and store images with computers, the number of images does not reliably provide the distinction between large-scale and small-scale child pornography purveyors that Congress and the Sentencing Commission envisioned when promulgating the enhancement.")

In discussing the Court's frustration with §2G2.2(b)(7), *Raby* noted that—unlike most guidelines—§2G2.2 is "not grounded in empirical analysis, but rather on statutory directive." *Id*. at *6, *citing* Troy Stabenow, *Deconstructing the Myth of Careful Study: A Primer on the Flawed Progression of the Child Pornography Guidelines* 4-24, July 3, 2008, http://www.fd.org/odstb_SentencingResource3.htm. In other words, §2G2.2 is a product of congressional mandate, as opposed to the "'careful study [by the Sentencing Commission] based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions.'" *Id*., *quoting Gall v. United States,* 552 U.S. 38, 128 (2007). As such, "the sentencing enhancements advised by the Guidelines based upon number of images possessed appears to be divorced from any actual study of increase in harm caused by the offender."[6]

---

[6] Jelani Jefferson Exum, Making the Punishment Fit the (Computer) Crime: Rebooting Notions of Possession for the Federal Sentencing of Child Pornography Offenses, Richmond Journal of Law and Technology Volume XVI Issue 3 (2010) at 37.

In creating the "number of images" enhancement, Congress apparently reasoned that cases with more images have a greater impact on the child pornography market.[7]  As *Raby* correctly notes, however, there is "little connection between the number of images received by a child pornographer and his moral culpability in committing an offense."  *Id.*  Additionally, "the worldwide market for child pornography is so vast that the relative market impact of having additional images [that exceed the 600 image threshold] is miniscule."  *Id.* at *7.  Accordingly, *Raby* concluded that "the de minimis market effect of a few hundred images simply does not justify sentencing a man to [significant additional prison time.]"  *Id.*

This reasoning is sensible.  Can the Court imagine enhancing a defendant's sentence in a drug possession case based on the number of times they had consumed an illicit substance over the course of their addiction?  Sentencing schemes—whether guidelines based or not—make no such distinction between drug users, as they should not.  Similarly, the federal guidelines should not try to make such an artificial and arbitrary distinction between child pornography defendants (once more, virtually all of whom possess far more than the threshold 600 images anyway).  For this reason, Mr. Seiffertt asks the Court to adjust his sentence to circumvent the unreasonably harsh enhancement he received under §2G2.2(b)(7).

Generally speaking, "when it comes to child pornography possession, computers and the internet make it easier to amass more sentencing enhancements without necessarily being a more harmful offender."[8]  This holds true for Joe.  While his offense is undoubtedly

---

[7] *Id.*
[8] *Id.* at 33.

serious, he committed it in an unremarkable manner and accrued an unremarkable number of images.  Nevertheless, he received a total of seven additional points for possessing more than 600 images on a computer, leading to a guideline range of 135-168 months.  Without those seven points, his range would be 63-78 months.[9]  His requested 60-month term is a mere three months below this lower and more appropriate range.

Joe Seiffertt is a 44-year-old military veteran with virtually no criminal history. Having suffered from PTSD that he was too ashamed to treat clinically, he saw his marriage disintegrate while self-medicating with alcohol and pornography.  What started with the legal consumption of age-appropriate pornographic material eventually escalated into an affinity for the illicit.  But it never did—nor will it ever—denote a proclivity for hands-on offending.  As an individual who is educationally prepared, now open to clinical intervention, and has never been to prison, Joe urges the Court to agree that five years is both a substantial and adequate sentence that is consistent with the spirit of § 3553(a). He intends to use it well by maintaining the trajectory of therapeutic development already under way before his sudden confinement in this case.  Equally important, he intends to utilize the resources available through the probation office during any ensuing term of supervised release—resources that he hopes (largely for the sake of supporting his family) to harness sooner than later.  Accordingly, he asks that the Court accept his request for a downward variance and impose a sentence of 60 months.

---

[9] It is also worth noting that according to data collected by the Sentencing Commission's Judiciary Sentencing Information (JSIN), the average sentencing imposed for defendants with a base offense level of 33 who fall under Criminal History Category I is 106 months, while the median sentence is 108.

Respectfully submitted,


/s/William T. Marsh
WILLIAM T. MARSH #60906MO

Assistant Federal Public Defender
1010 Market Street, Suite 200
St. Louis, Missouri 63101
Telephone: (314) 241-1255
Fax: (314) 421-3177
E-mail: Bill_Marsh@fd.org

ATTORNEY FOR DEFENDANT


## CERTIFICATE OF SERVICE


I hereby certify that on May 11, 2026, the foregoing was filed electronically with the Clerk of the Court to be served by operation of the Court's electronic filing system upon Jillian Anderson, Assistant United States Attorney.


/s/William T. Marsh
WILLIAM T. MARSH #60906MO

11